19JE-CC00595
Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, STATE OF MISSOURI**

KIMBERLY ABRAM, *et al.*,

Plaintiffs,

v.

TITLEMAX OF MISSOURI, INC.
**Serve: C T CORPORATION SYSTEM**
**120 South Central Avenue**
**Clayton, MO 63105**,

Defendant.

Case No.
Division

**JURY TRIAL DEMANDED**

## Petition

Plaintiffs sue Defendant TitleMax of Missouri, Inc. ("TitleMax"):

### Nature of Case

1. This is a consumer claim against TitleMax seeking relief to redress an unlawful and deceptive pattern of wrongdoing conducted by TitleMax regarding the formation, collection, and enforcement of its title loan agreements and its disposition of consumer property secured by its title loan agreement agreements.

2. TitleMax violated §§ 367.500 to 367.533 regarding its title loans with each plaintiff.

3. TitleMax wrongfully accelerated the maturity of the unpaid balance under its title loan agreements otherwise wrongfully enforced its security interest under title loan agreements because TitleMax either failed to give each plaintiff right to cure notices required by § 408.554 or gave defective right to cure notices.

4. TitleMax repossessed each plaintiffs motor vehicle.

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

5. TitleMax failed to send each plaintiff a presale notice that complied with the Uniform Commercial Code ("UCC") adopted by Missouri.

6. TitleMax failed to send each plaintiff a post-sale notice, which complied with the UCC.

7. TitleMax breached its title loan agreements with each plaintiff.

8. Each plaintiff seeks actual damages and such other further relief as this Court may deem appropriate.

## Parties

9. Each plaintiff is identified on **Exhibit A**. Each plaintiff is a resident of Missouri.

10. TitleMax is a Delaware corporation, headquartered at 15 Bull Street, Suite 200, Savannah, Georgia 31401, which does substantial business in Missouri. TitleMax of Missouri, Inc. does business as TitleMax and TitleBucks. TitleMax is not a resident of Missouri.

## Jurisdiction and Venue

11. This is a civil case, so this Court has jurisdiction.

12. Each plaintiff has a separate and distinct claim and has united for convenience and economy in a single suit.

13. No plaintiff seeks more than $75,000, exclusive of interest and costs.

14. Venue is proper in this Court under § 508.010.2 because there is no count alleging a tort and TitleMax is a nonresident of Missouri.

## Organizational Structure of TitleMax

15. The TitleMax family of companies includes: (1) TitleMax Finance Corp., (2) TMX Finance LLC, (3) TMX Finance Holdings Inc., (4) TitleMax Holdings, LLC, (5) TMXA, LLC, (6) TMX Credit, Inc., (7) TMX Investments, LLC., (8) TitleMax Funding, Inc., (9) TitleMax Management Services, Inc., and (10) TitleMax Construction, LLC.

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

16. TMX Finance LLC has multiple wholly-owned operating subsidiaries set up in various states, including TitleMax of Alabama, Inc.; TitleMax of Arizona, Inc.; TitleMax of Georgia, Inc.; TitleMax of Illinois, Inc.; TitleMax of Mississippi, Inc.; TitleMax of Missouri, Inc.; TitleMax of Nevada, Inc.; TitleMax of S. Carolina, Inc.; TitleMax of Tennessee, Inc.; TitleMax of Texas, Inc.; and TitleMax of Virginia, Inc.

17. Although the TitleMax family of companies may be registered as separate companies, in reality they all operate together as a single entity under the joint control of Tracy Young ("Young"), with no separation.

18. Despite these multiple subsidiaries, TitleMax operates as a single entity, under the control of Young. There is no meaningful division or separation between the entities within the TitleMax family of companies.

19. All TitleMax stores, regardless of whether they may be owed by any subsidiary, are operated under a company-wide risk management system supported by district and regional managers all under the same central leadership of Mr. Young.

20. Young is the founder, Chairman of the Board, Chief Executive Officer, President and the sole beneficial owner of TMX Finance LLC's parent holding company, TMX Finance Holdings Inc., and all other TitleMax companies. He is also the CFO and the Secretary.

21. Young controls substantially all matters of significance to all TitleMax companies, including the strategic direction of their business; the election and removal of their managers; the appointment and removal of their officers; the approval or rejection of a sale, merger, consolidation or other business combination; the issuances of additional equity or debt securities; amendments of its organizational documents; and the entering into of related party transactions and the dissolution and liquidation.

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

22. TMX Finance LLC's principal corporate office is at 15 Bull Street, Suite 200, Savannah, Georgia 31401. This is the same address listed by the Missouri Secretary of State's records for TitleMax of Missouri, Inc., and on information and belief, the same address for the other TitleMax companies.

23. TitleMax has over 1,400 company-owned stores in 17 states (Alabama, Arizona, California, Delaware, Georgia, Illinois, Mississippi, Missouri, Nevada, New Mexico, Ohio, South Carolina, Tennessee, Texas, Utah, Virginia, and Wisconsin).

**Title Loans**

24. Title loans are expensive loans secured by the title to a vehicle or other consumer property that the borrower owns free-and-clear.

25. Title loans are traditionally offered as single-payment loans with one-month terms, which are often renewed multiple times.

26. An emerging practice is a movement toward title loans that are longer-term, high-cost installment products.

27. Title loans are marketed as a quick financial fix but lead to long-term debt and carry obscene annual interest rates often higher than 200%.

28. A typical borrower on a title loan pays twice as much in interest and fees than the borrower receives in credit extended.

29. Nationally, car title lending drains $4.3 billion annually in excessive fees.

30. Title lenders engage in asset-based lending (making loans without evaluating the borrower's ability to repay the loan). Instead, lenders base whether and how much to lend on the value of the collateral.

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

31. Car-title loans are based on the value of a borrower's car owned free-and-clear, rather than the ability of the borrower to repay the loan and meet other obligations without re-borrowing.

32. A typical car-title loan requires no credit check, and lenders rarely ask about monthly expenses or debts. Some do not ask about income or require that the borrower have a bank account.

33. Rather than properly underwriting the loans based on a borrower's income and obligations, lenders protect themselves from loan losses by lending only a small percentage (about one-quarter) of the car's consumer resale value (commonly known as "Blue Book" value) and repossessing the vehicle if default occurs.

34. Title lenders generally have no interest in whether the consumer borrowing the money can afford to pay back the loan or make the monthly interest payments. Ability to repay is not part of the underwriting process. Because some lenders lend at a small percentage of the car's value, title lenders can rely on selling the car if the borrower stops making the monthly payments.

35. Title lenders systematically disregard a borrower's ability to repay, as demonstrated through at least three modes: lenders' advertising and marketing, industry data and statements, and negative consumer outcomes—namely, repeat loan refinancings and vehicle dispositions.

36. An analysis of the records from 561 auto title borrowers shows the median loan size was $845, the median car value (Blue Book value) was $3,150, the median loan-to-value ratio was 26% and the median APR was 300%.[1]

[1] Claire McCaskill, State Auditor, Performance Audit Report No. 2001-36, at 4 (Mo. 2001).

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

37. The Missouri Auditor's report documented that 70% of title and payday loan consumers earned less than $25,000 per year.[2]

38. Half of all car-title borrowers are unbanked, lacking access to both mainstream and subprime credit.[3]

39. For consumers living paycheck to paycheck, the short timeframe of these loans can make it difficult to accumulate the necessary funds to pay off the loan principal and fees before the due date.[4]

40. Borrowers who cannot repay are often encouraged to roll over the loan – pay more fees to delay the due date or take out a new loan to replace the old one.[5]

41. For many borrowers, what starts out as a short-term, emergency loan turns into an unaffordable, long-term debt trap.[6]

42. In Missouri, "on average, title . . . lenders make 3.5 times more renewal loans than new loans each month."[7]

43. The 2001 Missouri Auditor's Report provides a real-life example:

> A consumer obtained a title loan for $900 on July 7, 2000, renewed the loan 3 times paying $902 in interest and fees, but made no reductions in the principal amount. The consumer obtained this loan against her 1993 Buick Century. She was 67 years old, living on a fixed income, and as of October 2000 her loan was still open. She has already paid the equivalent of the loan value in fees, and still owes the $900. This practice will continue until the consumer starts paying on the principal. In this example, the consumer is "hanging on" by paying fees but has still not been able to satisfy the loan.

44. Additional history on title loans and lenders is attached as **Exhibit B**.

---

2 http://www.responsiblelending.org/state-of-lending/reports/7-Car-Title-Loans.pdf.
3 *Id.*
4 http://www.consumerfinance.gov/newsroom/cfpb-considers-proposal-to-end-payday-debt-traps/
5 *Id.*
6 *Id.*
7 The 2001 Missouri Auditor's Report, at 3.

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

## TitleMax's Business

45. TitleMax acts as a title lender without a title loan license.

46. TitleMax offers to lend money at high rates of interest, with its title loans secured by titles to consumer's motor vehicle.

47. TitleMax is one of the nation's largest title lending companies, providing over 2,500 consumers title loans every day.[8]

48. TitleMax specializes in motor vehicle title loans, which it advertises as "a fast and easy way to get cash using your car title instead of your credit score."[9,10]

49. TitleMax markets its loans as "title loans." [11,12]

50. TitleMax markets itself as a title lender that issues title loans. [13,14]

51. TitleMax has submitted business applications in Missouri listing "Title Loans" as one of its types of business and "Title Lending" as the nature of its business.

52. TitleMax's parent company has stated in Missouri, title loans receivable comprise 24-month title loans with payments of principal and interest due monthly.

53. TitleMax's parent company has stated TitleMax is a wholly-owned title lending subsidiary.

54. TitleMax's title loans are expensive loans secured by the title to a vehicle or other consumer property that the borrower owns free-and-clear.

55. TitleMax title loans are marketed as a quick financial fix, but lead to long-term debt and carry obscene annual interest rates often as high as 200%, if not more.

---

[8] https://www.titlemax.com/about-us/
[9] https://www.titlemax.com/about-us/
[10] https://www.titlemax.com/title-loans/
[11] https://www.titlemax.com/about-us/
[12] https://www.titlemax.com/title-loans/
[13] https://www.titlemax.com/about-us/
[14] https://www.titlemax.com/title-loans/

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

56. TitleMax advertises that it makes the "title lending process simple" and it will determine a title loan amount based upon the consumer's need and the appraised value of the vehicle.[15]

57. TitleMax advertises that consumers are eligible for title loans even if they have bad credit or no credit.[16]

58. TitleMax has stated that "All underwriting decisions are made based on the appraised wholesale value of a customer's vehicle rather than credit score."[17]

59. TitleMax engages in asset-based lending, basing whether and how much to lend on the value of the collateral.

60. TitleMax's title loans are based on the value of a borrower's car owned free-and-clear, rather than the ability of the borrower to repay the loan and meet other obligations without re-borrowing.

61. TitleMax requires no credit check, and rarely asks about monthly expenses or debts.

62. TitleMax's borrowers have zero power to negotiate the title loan agreement, including a reasonable interest rate or the waivers of their rights and protections, and will pay whatever amount TitleMax charges.

63. TitleMax's title loan agreement are non-negotiable and difficult for the average consumer to understand

64. On information and belief, no consumer has ever successfully renegotiated the standard terms of TitleMax's title loan agreement.

---

[15] https://www.titlemax.com/faqs/
[16] https://www.titlemax.com/faqs/
[17] http://www.sec.gov/Archives/edgar/data/1511966/000119312511107453/d424b1.htm

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

65. Rather than properly underwriting the loans based on a borrower's income and obligations, TitleMax protects itself from loan losses by lending only a small percentage of the conservative wholesale value of the customer's automobile in the Black Book, as opposed to the higher retail value in the Black Book.

66. TitleMax has no interest in whether the consumer borrowing the money can afford to pay back the loan or make the monthly interest payments.

67. Ability to repay is not part of the underwriting process for TitleMax.

68. Because TitleMax lends at a small percentage of the car's value, TitleMax relies on taking and selling the car if the borrower stops making the monthly payments.

69. TitleMax's typical car title loan is refinanced eight times according to testimony given by a former president of TitleMax.

70. TitleMax relies on loan renewals as underpinning its business structure.

71. TitleMax systematically disregards a borrower's ability to repay, as demonstrated through at least three modes: its advertising and marketing, industry data and statements, and negative consumer outcomes—namely, repeat loan refinancings and vehicle dispositions.

## General Allegations

72. Each plaintiff signed a title loan from TitleMax secured by his or her motor vehicle title.

73. Each plaintiff's title loan agreement required him or her to deliver title of a motor vehicle to TitleMax and allow TitleMax to note its lien on the certificate of title.

74. The title loan agreement signed by each plaintiff is a standardized form.

75. The title loan agreement signed by each plaintiff was for personal, family, or household purposes and the motor vehicle was used for personal, family, or household purposes.

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

76. Each plaintiff's title loan agreement with TitleMax is a consumer-goods transaction as the term is defined under the UCC.

77. TitleMax's actions were wanton, outrageous, and/or malicious because of its reckless indifference to or conscious disregard of each plaintiff's consumer rights.

## Count I – Declaratory Judgment

78. Each plaintiff repeats the allegations set forth above as if set forth in Count I.

79. A justiciable controversy exists between TitleMax and each plaintiff for which there is no adequate remedy at law.

80. TitleMax acts as a title lender without a title loan license.

81. Each plaintiff's title loan agreement was secured by title to his or her motor vehicle.

82. Sections 367.500 to 367.533 were enacted to protect the consumer borrower.

83. The title loan agreement represents transactions clearly within the spirit or reason of §§ 367.500 to 367.533, or within the evil which those statutes were designed to remedy.

84. Each plaintiff's title loan agreement with TitleMax violated Missouri law for at least one or all the following reasons:

a. As required by § 367.512.1(4), the title loan agreement failed to disclose TitleMax must renew the title loan agreement upon the borrower's written request and the payment by the borrower of any interest due at the time of such renewal. However, upon the third renewal of any title loan agreement, and any subsequent renewal, the borrower shall reduce the principal by ten percent until such loan is paid in full.

b. As required by § 367.518.1(2), the title loan agreement failed to disclose in at least ten-point bold type, that nonpayment of the title loan may cause loss of the borrower's vehicle or other titled personal property.

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

c. As required by § 367.518.1(4), the title loan agreement failed to disclose the monthly interest rate to be charged.

d. As required by § 367.518.1(2), the title loan agreement failed to disclose a statement, in at least ten-point bold type, separately acknowledged by the signature of the borrower and reading: "You may cancel this loan without any costs by returning the full principal amount to the lender by the close of the lender's next full business day."

e. As required by § 367.525.1, TitleMax failed to provide the notice specified in § 367.525.1 before accepting a title loan application from each plaintiff that resulted in the title loan agreement.

f. As required by § 367.525.4, TitleMax failed to consider each plaintiff's financial ability to reasonably repay the title loans evidenced by the title loan agreement.

g. As prohibited by § 367.527.1(2), TitleMax made loans exceeding $5,000.

h. As prohibited by § 367.527.1(3), TitleMax accepted the waiver of rights and protections for the borrower in the title loan agreement.

i. As prohibited by § 408.553, the title loan agreement provided interest will accrue from the date the borrower defaulted until a final judgment.

j. As required by § 367.512.1(4), failed to reduce the principal of the loan by 10% upon the third and subsequent renewals.

k. Otherwise failed to include all necessary and required disclosures in the title loan agreement signed by each plaintiff.

l. Otherwise failed to provide all required notice to each plaintiff.

m. Collected interest, fees, and disposed of each plaintiff's motor vehicle on a void title loan agreement.

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

85. TitleMax knowingly violated §§ 357.500 to 367.533 in violation of § 367.527.

86. TitleMax violated §§ 357.500 to 367.533 when conducting transactions with each plaintiff, rendering the title loan agreement void under § 367.527.2.

87. Each plaintiff is not bound by the title loan agreement.

88. Each plaintiff requests the Court enter judgment in his or her favor and against TitleMax as described in the "Prayer for Relief."

**Count II – Private Right of Action under Chapter 367**

89. Each plaintiff repeats the allegations set forth above as if set forth in Count II.

90. Sections 367.500 to 367.533 protect consumer borrowers by requirement and proscription of certain conduct but provide no express civil remedy to persons injured by a title lenders failure to comply with sections 367.500 to 367.533.

91. TitleMax violated §§ 367.500 to 367.533 when negotiating, offering, soliciting, or entering into the title loan agreement with each plaintiff.

92. As a direct and proximate result of TitleMax's failure to comply with the requirements of §§ 367.500 to 367.533, each plaintiff suffered actual damages, including:

a. Paying principal, fees and interest on loans issued without consideration for Each plaintiff's ability to repay the title loan.

b. Paying excess interests and fees because TitleMax failed to reduce the principal by at least 10% upon the third and subsequent renewals.

c. Violations of statutorily required notice and disclosure requirements in the title loan agreement.

d. Paid fees and incurred costs besides the principal on the loan.

e. Other uncertain and hard-to-quantify actual damages.

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

93. Each plaintiff requests the Court enter judgment in his or her favor and against TitleMax as described in the "Prayer for Relief."

## Count III – Chapter 408 Violations

94. Each plaintiff repeats the allegations set forth above as if set forth in Count III.

95. Section 408.553 prohibits a lender from charging or collecting interest after default until after a final judgment is obtained.

96. Contrary to § 408.553, the title loan agreement provides interest will continue to accrue on the title loan agreement after default even if no final judgment is obtained.

97. TitleMax did not seek a deficiency judgment or other judgments against each plaintiff.

98. TitleMax violated Chapter 408 by collecting or charging interest that accrued after default but before any final judgment was obtained.

99. Section 408.555 prohibits TitleMax from accelerating the maturity of the unpaid balance or otherwise enforcing its security interest until the notice required by § 408.554 is given.

100. TitleMax failed to give each plaintiff the notice required by § 408.554 before it accelerated the maturity of the unpaid balance under the title loan agreement.

101. TitleMax failed to give each plaintiff the notice required by § 408.554 before it sold the collateral secured by the title loan agreement.

102. TitleMax violated Chapter 408 by accelerating the maturity of the unpaid balance under the title loan agreement.

103. TitleMax violated Chapter 408 by selling the collateral secured by the title loan agreement.

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

104. TitleMax's violation of Chapter 408 also violate §§ 367.512.1(6), (7) and 367.521, rendering the title loan agreement void under § 367.527.2.

105. As a direct and proximate result of TitleMax's violations of Chapter 408, each plaintiff suffered, and continues to suffer, actual damages not less than the minimum damages provided by § 400.9-625(c)(2), including:

a. Wrongfully collected amounts of interest.

b. The surplus after disposition of the collateral that would be equal to the proceeds of disposition minus the wrongfully accrued interest and unaccelerated balance due on the consumer loan contract.

c. Paying principal, fees and interest on loans issued without consideration for each plaintiff's ability to repay the title loan.

d. Paying excess interest and fees because TitleMax failed to reduce the principal by at least 10% upon the third and subsequent renewals.

e. Violations of statutorily required notice and disclosure requirements in the title loan agreement.

f. Paid fees and incurred costs besides the principal on the loan.

g. Harm caused by defamation, slander and libel.

h. Harm caused by invasion of privacy.

i. Damage to credit.

j. Other uncertain and hard-to-quantify actual damages.

106. Each plaintiff is entitled to attorney's fees under § 408.562.

107. Each plaintiff is entitled to punitive damages under § 408.562.

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

108. Each plaintiff requests the Court enter judgment in his or her favor and against TitleMax as described in the "Prayer for Relief."

**Count IV – UCC Violations**

109. Each plaintiff repeats the allegations set forth above as if set forth in Count IV.

110. TitleMax violated the UCC by failing to send the presale notice in the form and manner required under the UCC before disposing of collateral secured by loans between TitleMax and Each plaintiff.

111. Alternatively, TitleMax violated the UCC by sending presale notice to each plaintiff that included additional language or content not authorized or allowed by law, rendering the presale Notice misleading or unreasonable in violation of §§ 9-611 and 9-614 of the UCC.

112. As required under § 9-611 of the UCC, TitleMax failed to provide "reasonable authenticated notice of disposition" to each plaintiff.

113. TitleMax violated § 9-615 of the UCC by applying the proceeds of sale in the wrong order.

114. TitleMax did not send post-sale notice, or any other explanation or writing, to each plaintiff providing all the information, in the requisite order, as required by § 9-616 of the UCC.

115. If post-sale Notice were sent, the post-sale Notice sent to each plaintiff failed to comply with § 400.9-616 because.

116. Future debits, credits, charges, including additional credit service charges or interest, rebates, and expenses affected the surplus or deficiency for each plaintiff.

117. TitleMax's failure to provide a statutorily compliant post-sale notice is part of a pattern, or consistent with a practice, of noncompliance.

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

118. TitleMax's violation of Chapter 400 also violate §§ 367.512.1(6), (7) and 367.521, rendering the title loan agreement void under § 367.527.2.

119. As a direct and proximate result of TitleMax's failure to comply with the requirements of Subchapter 6 of Article 9 of the UCC, each plaintiff suffered actual damages not less than the minimum damages provided by § 400.9-625(c)(2), including:

a. Harm caused by defamation, slander, and libel.

b. Harm caused by invasion of privacy.

c. Violations of statutorily required notice and disclosure requirements in the title loan agreement.

d. Other uncertain and hard-to-quantify actual damages.

120. Each plaintiff requests the Court enter judgment in his or her favor and against TitleMax as described in the "Prayer for Relief."

## Count V – Breach of Title Loan Agreement

121. Each plaintiff repeats the allegations set forth above as if set forth in Count V.

122. Plaintiffs plead Count V in the alternative to Counts I and II for each plaintiff who is found to have a valid and enforceable title loan agreement.

123. Each valid and enforceable title loan agreement required TitleMax to declare all amounts outstanding under the title loan agreement immediately due and payable before it repossessed and foreclosed on each plaintiff's vehicle.

124. TitleMax breached each valid and enforceable title loan agreement because it repossessed the vehicles before declaring all amounts outstanding under the title loan agreement immediately due and payable.

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

125. TitleMax breached each valid and enforceable title loan agreement because it foreclosed upon the vehicles before declaring all amounts outstanding under the title loan agreement immediately due and payable.

126. As a direct and proximate result of TitleMax's breach, each plaintiff suffered actual damages not less than the minimum damages provided by § 400.9-625(c)(2), including:

a. Harm caused by defamation, slander, and libel.

b. Harm caused by invasion of privacy.

c. Violations of statutorily required notice and disclosure requirements in the title loan agreement.

d. Other uncertain and hard-to-quantify actual damages, including loss of the vehicle (and all improvements made to the vehicle), cost of insurance premiums, expenses and labor by each plaintiff and others on their behalf directly related to coping with the repossession, the value of each plaintiff's efforts and others to cover for problems caused by the lack of a car, loss of use of the vehicle, inconvenience, aggravation, embarrassment, frustration, humiliation, and emotional distress.

127. Each plaintiff requests the Court enter judgment in his or her favor and against TitleMax as described in the "Prayer for Relief."

### Count VI – Breach of Arbitration Agreement

128. Each plaintiff repeats the allegations set forth above as if set forth in Count VI.

129. Plaintiffs plead Count VI for each plaintiff who TitleMax maintains is bound by a valid and enforceable arbitration agreement.

130. For each arbitration agreement, TitleMax agreed to pay all filing, hearing, and third-party arbitrator fees ("Arbitration Fees").

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

131. Each plaintiff bound by a valid and enforceable arbitration agreement that covers a dispute with TitleMax demanded that TitleMax advance or pay the Arbitration Fees so each plaintiff could file an individual arbitration for covered disputes.

132. Each plaintiff bound by a valid and enforceable arbitration agreement that covers a dispute with TitleMax is acting in good faith.

133. Each plaintiff bound by a valid and enforceable arbitration agreement that covers a dispute with TitleMax cannot get a fee waiver.

134. TitleMax refused to advance the Arbitration Fees for each plaintiff bound by a valid and enforceable arbitration agreement that covers a dispute with TitleMax.

135. TitleMax refused to pay the Arbitration Fees for each plaintiff bound by a valid and enforceable arbitration agreement that covers a dispute with TitleMax.

136. TitleMax is in default in proceeding with arbitration for each plaintiff bound by a valid and enforceable arbitration agreement that covers a dispute with TitleMax for its refusal and failure to pay the Arbitration Fees.

137. TitleMax is in breach of contract for its refusal and failure to advance or pay the Arbitration Fees for each plaintiff bound by a valid and enforceable arbitration agreement that covers a dispute with TitleMax.

138. As a direct and proximate result of TitleMax's breach, each plaintiff bound by a valid and enforceable arbitration agreement that covers a dispute with TitleMax suffered actual damages not less than the Arbitration Fees.

139. For each plaintiff bound by a valid and enforceable arbitration agreement that covers a dispute with TitleMax, Plaintiffs request TitleMax be ordered to pay all Arbitration Fees before or commensurate with compelling arbitration of any covered dispute.

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

140. Each plaintiff requests the Court enter judgment in his or her favor and against TitleMax as described in the "Prayer for Relief."

## Prayer for Relief

WHEREFORE, each plaintiff prays this Court enter a judgment for each plaintiff against TitleMax:

a. Declaring the title loan agreement and liens were contrary to Missouri title loan law and are void under §§ 367.527.1.7 and 367.527.2.

b. A preliminary and permanent injunction enjoining TitleMax from engaging in the practices alleged, including without limitation, enjoining TitleMax from negotiating, soliciting, or offering loans secured by a motor vehicle title that do not comply with §§ 367.500 to 367.533.

c. Ordering TitleMax disgorge all money collected on the title loan agreement that exceeded the original amount financed or $5,000, whichever is less, including money collected by disposition of the motor vehicle.

d. Awarding actual damages, including damage to credit.

e. Statutory damages of $500 for each defective post-sale notice sent.

f. Prejudgment and post-judgment interest.

g. Punitive damages.

h. Attorney's fees.

i. For each plaintiff bound by a valid and enforceable arbitration agreement that covers a dispute with TitleMax, ordering TitleMax to pay all Arbitration Fees before or commensurate with compelling arbitration of any covered dispute.

j. For such other and further relief as this Court deems just and proper.

Electronically Filed - Jefferson - August 09, 2019 - 03:31 PM

**ONDERLAW, LLC**

By: */s/ James G. Onder*
James G. Onder, #38049
Martin L. Daesch, #40494
Jesse B. Rochman, #60712
110 E. Lockwood Ave.
St. Louis, MO 63119
(314) 963-9000 (telephone)
(314) 963-1700 (facsimile)
onder@onderlaw.com
daesch@onderlaw.com
rochman@onderlaw.com
*Attorneys for Claimant*